**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | No. 23 CR 443 |
| v. | ) | |
| | ) | Chief Judge Virginia M. Kendall |
| MARCUS MCKAY, | ) | |
| | ) | |
| *Defendant*. | ) | |

**MEMORANDUM OPINION AND ORDER**

Defendant Marcus McKay was charged with unlawfully possessing a firearm as a felon in violation of 18 U.S.C. § 922(g)(1). In July 2025, a federal jury found him guilty. McKay now moves for a new trial, (Dkt. 130), and for a judgment of acquittal, (Dkt. 133). For the following reasons, both Motions [130] [133] are denied.

**BACKGROUND**

McKay was charged with violating 18 U.S.C. § 922(g)(1), which makes it illegal for a felon to knowingly possess a firearm. (Dkt. 41). The Superseding Indictment alleged that McKay possessed a semi-automatic pistol and multiple cartridges of ammunition from November 1, 2022 to December 14, 2022. (*Id.*). At the start of a four-day trial, McKay stipulated that he had been convicted of a felony prior to November 1, 2022, and that he knew of this conviction. (Dkt. 122, Tr. 32:12-18); (Dkt. 114 at 2). The evidence at trial established that McKay was arrested on December 14, 2022 at "7752 South Muskegon, Apartment 2" in Chicago, Illinois ("Apartment 2"), where he was living without authorization. (Dkt. 134 at 3); (Dkt. 122, Tr. 142:16-143:6). Riley

DeSantis, an employee of the apartment building's management company, testified that Apartment 2 was unleased at the time of McKay's arrest. (*Id.* at 40:21-41:2). McKay's parole officer testified that, five days before his arrest, McKay reported that he was living at that address. (*Id.* at 69:11-25).

According to DeSantis, the management company began reviewing surveillance footage of the stairwell outside of Apartment 2 after receiving complaints from residents in that area of the property. (*Id.* at 42:13-43:5). DeSantis sent footage of that stairwell captured on November 2, 2022 to the Chicago Police Department ("CPD"), which led to the investigation and search of Apartment 2. (*Id.* at Tr. 46:19-47:11). The jury watched the surveillance video. (Def. Ex. No. 400). It shows a Black man in light jeans, a gray sweatshirt, and a black hat brandishing a gun in the stairwell between Apartment 2 and the unit below. (*Id.*). The man follows another individual wearing a red hat and then talks to a woman. (*Id.*). Officer Patrick Wilkison, one of the CPD officers who searched Apartment 2 and arrested McKay, testified that the object in the man's hand was a gun. (Dkt. 122, Tr. 147:20-148:1).

The jury also heard testimony from the woman in the video, Shari Jones. Jones identified McKay as the man she saw and spoke to in the video. (Dkt. 122, Tr. 100:4-24). Jones testified that she lived in a unit on the floor below Apartment 2. (*Id.* at 93:3-94:5). She further testified that she had met McKay at the apartment building several months before his arrest, knew him well, and that she and McKay had sex "a couple of times." (*Id.* at 94:6-25, 96:2-8). When asked to describe what the surveillance footage depicted, Jones said the man in the red hat whom McKay was following was a friend coming to visit her. (*Id.* at 97:3-8, 99:11:24). Jones confronted McKay outside of her apartment and saw him with a gun in his hand. (*Id.* at 100:25-101:6). She asked him why he had a gun and told him to leave her visitor alone. (*Id.* at 103:13-104:7). Jones further

testified that she had seen McKay holding a gun on previous occasions. (*Id.* at 104:12-14). She knew they were "real" guns because she heard the shooting and saw shell casings outside. (*Id.* at 104:15-22).

On cross-examination, Jones testified that she received a deal from the prosecution under which her testimony from trial would not be used against her in any of her ongoing criminal proceedings. (*Id.* at 106:14-107:8). With respect to her criminal history, Jones testified that she pleaded guilty to burglary in 2014. (*Id.* at 115:3-118:2). When asked about a charge of false informing from 2022, Jones stated that she had been stopped by officers at a grocery store and accused of shoplifting and providing a false name. (*Id.* at 108:9-110:25). She denied using the wrong name and explained that, to her knowledge, she was then arrested on an outstanding warrant for driving an unsafe vehicle. (*Id.* at 110:11-13, 112:3-9). She also denied that she was charged for false informing from this incident. (*Id.* at 111:17-25). When asked if she had a false informing conviction from 2004, Jones testified that, to her knowledge, she did not. (*Id.* at 112:10-114:15). McKay's attorney offered to show Jones a printout of her criminal history to refresh her recollection, but Jones declined, stating, "I know what my criminal history is. I don't care what you show me." (*Id.* at 112: 20-21).

Jones also testified on cross-examination that she was diagnosed with schizophrenia in 2002 and takes several medications to treat it. (*Id.* at 118:15-20, 124:6-126:24). She denied that her mental health conditions or medications affect her memory. (*Id.* at 127:17-128:12). Jones also denied that she is an alcoholic. (*Id.* at 128:13-15). She admitted that she had been recently arrested for driving while intoxicated after being found sleeping in her car with an open container of alcohol. (*Id.* at 128:16-129:24). When asked if she had requested or received a reward for her testimony, she said no. (*Id.* at 133:23-134:9). An officer testified later in the trial that Jones had

sent him a text message stating, "I see and read all the time about rewards for information. I have all the answers and can give you key info about other people. I need a reward." (Dkt. 123 at 332:8-16). The officer further testified that Jones did not receive any award in exchange for her testimony. (*Id.* at 333:11-13).

The jury then heard testimony from the officers who searched Apartment 2 and arrested McKay. They also watched body camera footage of the search and arrest. McKay told officers that he was "on parole" at the apartment. (Dkt. 122, Tr. 157:10-12). After the officers removed McKay from the apartment, he requested several of his items from inside and directed officers to their locations. (*Id.* at 156:16-157:9). McKay also told the officers he needed to use the bathroom. (*Id.* at 155:3-5, 207:7:9). The officers then searched the apartment and found a loaded, privately manufactured firearm[1] in the toilet tank of the bathroom and a blue duffel bag in the bedroom containing ammunition, a semi-automatic pistol, and a latex glove. (Dkt. 123, Tr. 242:22-243:6, 238:10-240:6, 286:20-25, 295:3-12, 296:1-304:9). They also found what appeared to be the clothes the man was wearing in the surveillance footage. (*Id.* at 245:9-246:14, 248:16-24). After the search, McKay asked the officers if they had found a gun in the bathroom. (Dkt. 122, Tr. 159: 21-23).

Agents and forensic analysts testified that they collected DNA and fingerprint evidence from items found during the search of Apartment 2 and obtained DNA from McKay through a buccal swab. (Dkt. 122, Tr. 175:4-6; 328:10-330:5). A forensic scientist from the Illinois State Police testified that the two fingerprints found on the items did not belong to McKay. (*Id.* at 390:9-391:17). Stephanie Hill, a forensic examiner for the Federal Bureau of Investigation ("FBI"),

[1] The manufactured firearm was not charged in the Superseding Indictment. (Dkt. 41). Before trial, the Court ruled that evidence and testimony about the manufactured firearm was admissible, but it could not be referred to as a "ghost gun." (Dkt. 86).

testified that she compared McKay's DNA to the DNA collected from the items found in the apartment. (Dkt. 124, Tr. 442:2-15). She could not do a DNA comparison for the pistol because there was no DNA found on it. (*Id.* at 442:19-443:14). She was able to make a comparison with the DNA collected from the manufactured firearm and glove found in the duffel bag. (*Id.* at 443:15-20, 446:2-5, 446:18-21). She determined there were three contributors of the DNA on both items and that there was enough support to conclude one of the contributors was McKay. (*Id.* at 44:12-19, 446:6-10, 446:18-447:19). The jury also heard testimony from a CPD firearms examiner, who testified that he tested and identified the firearms and ammunition found in Apartment 2. (Dkt. 122, Tr. 209:8-213:9).

Dr. Ruth Ballard testified for McKay as an expert on forensic biology and DNA. (Dkt. 124, Tr. 489:24-490:2). She testified that, in her expert opinion, it was possible that McKay's DNA ended up on the manufactured firearm and latex glove by indirect transfer. (*Id.* at 496:18-499:24, 504:6-506:19). She theorized that officers could have picked up McKay's DNA on their hands when they touched items in his apartment, and that DNA could have transferred onto the gloves the officers put on and then onto the manufactured firearm and latex glove. (*Id.* at 518:11-519:21). The defense also extensively cross-examined each of the Government's witnesses, raising issues such as the former tenant of Apartment 2 leaving behind his belongings (Dkt. 122, Tr. 48:9-49:23), access to Apartment 2 by people other than McKay (*Id.* at 58:9-59:4), and officers not wearing gloves for the entire search of Apartment 2. (Dkt. 123, Tr. 263:1-6, 269:5-7, 285:21-286:3, 316:15-317:13).

At the close of the Government's case, McKay's counsel orally moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29(a). (Dkt. 124, Tr. 555:8-9). They also made an oral motion for a mistrial based on the Government's refusal to correct what he argued was

false testimony from Jones. (*Id.* at 555:1-4); (Dkt. 125, Tr. 588:14-16). The Court denied both motions. (Dkt. 124, Tr. 576:22:24); (Dkt. 125, Tr. 588:17-18). Following the parties' arguments regarding the motion for a mistrial, the parties agreed to an additional stipulation regarding Jones's testimony. (Dkt. 124, Tr. 574:35-576:21). The parties stipulated that Jones allegedly gave police officers a false name and date of birth when she was arrested in Indiana on December 21, 2022 on an active warrant. (Dkt. 114 at 3). They further stipulated that Jones was charged with false informing in July 2023, that a summons was issued but was returned as "Not Served," and that Jones did not appear in the case. (*Id.*).

On July 28, 2024, the jury found McKay guilty. (Dkt. 117). McKay now moves for a new trial under Rule 33, (Dkt. 130), and renews his motion for a judgment of acquittal, (Dkt. 133). In the alternative, he seeks an evidentiary hearing. (Dkt. 132 at 1-2).

## DISCUSSION

### I. Motion for Judgment of Acquittal

#### A. Legal Standard

Under Federal Rule of Criminal Procedure 29, a court should grant a motion for judgment of acquittal only when "the evidence is insufficient to sustain a conviction.'" *United States v. Jackson*, 5 F.4th 676, 682 (7th Cir. 2021). A court reviewing a Rule 29 motion should "view[] the evidence in the light most favorable to the prosecution" and ask whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Filer*, 56 F.4th 421, 425 (7th Cir. 2022) (emphasis in original). The Court "may not 'reweigh evidence or reassess witness credibility and may uphold a conviction based on circumstantial evidence.'" *United States v. Foy*, 50 F.4th 616, 624 (7th Cir. 2022) (quoting *United States v. Medina*, 969 F.3d 819, 821 (7th Cir. 2020)). Though the defendant bears "a high, 'nearly

insurmountable hurdle[,]'" ultimately, "the height of the hurdle depends directly on the strength of the government's evidence." *Id.* (first quoting *United States v. Armbruster*, 48 F.4th 527, 531 (7th Cir. 2022); and then quoting *United States v. Moreno*, 922 F.3d 787, 793 (7th Cir. 2019)). In short, the defendant must show that the record "contains no evidence from which a reasonable juror could have found the defendant guilty." *United States v. Al-Awadi*, 873 F.3d 592, 600 (7th Cir. 2017) (quoting *United States v. Longstreet*, 567 F.3d 911, 918 (7th Cir. 2009)).

**B. Analysis**

When the Government initially moved for a judgment of acquittal during trial, McKay argued that the Government did not present sufficient evidence for a jury to find that he possessed a firearm. (Dkt. 124, Tr. 555:8-559:1). McKay pointed to issues with the Government's case, arguing that Jones was not credible, that McKay's fingerprints were not found on any items obtained during the search, and that it is reasonable to infer, based on how the officers conducted the search, that McKay's DNA was found on items through indirect transfer. (*Id.*). The Court denied McKay's oral motion for acquittal, holding that the Government presented sufficient evidence for the jury to decide the possession element of the charge. (*Id.* at 576:22-24). The Court reasoned that the jury should be the ones to decide Jones's credibility, and that they could conclude, without Jones, that the man in the surveillance video is McKay. (*Id.* at 562:14-18, 563:19-565:2). The Court also noted that there was other evidence that the jury could rely on to find that McKay was in possession of the pistol, including his statements about living in the apartment and his repeated requests to use the bathroom during the search. (*Id.* at 562:19563:8). Additionally, the Court held that the jury should be the ones to decide the dispute over the DNA evidence. (*Id.* at 563:9-15).

In his Renewed Motion, McKay reasserts that the Government put forth insufficient evidence at trial to establish that he possessed a firearm, as required to be convicted under § 922(g)(1). (Dkt. 133 at 3). To convict McKay of violating 18 U.S.C. § 922(g)(1), the Government had to prove beyond a reasonable doubt: (1) that McKay knowingly possessed a firearm; (2) that he was a convicted felon at the time he possessed the firearm; (3) that he knew at the time he possessed the firearm that he had been convicted of a crime punishable by imprisonment for more than one year; and (4) that the firearm traveled in interstate commerce. *United States v. Perryman*, 20 F.4th 1127, 1135 (7th Cir. 2021) (citations omitted). Possession may be either actual or constructive. *See United States v. Price*, 28 F.4th 739, 753 (7th Cir. 2022). The government can prove constructive possession with direct or circumstantial evidence showing the defendant's proximity to the firearm "coupled with evidence of some other factor—including connection with [an impermissible item], proof of motive, a gesture implying control, evasive conduct, or a statement indicating involvement in an enterprise." *United States v. Davis*, 896 F.3d 784, 790 (7th Cir. 2018) (alteration in original) (quoting *United States v. Griffin*, 684 F.3d 691, 696 (7th Cir. 2012)).

McKay argues there was insufficient evidence for a rational trier of fact to find that he possessed the pistol or ammunition found in Apartment 2. (Dkt. 133 at 3-6). First, he argues that Jones, the only witness who testified to seeing McKay with a firearm, was not credible and had no expertise to tell the difference between a real gun and a replica. (Dkt. 133 at 3-5). He also argues that the surveillance footage is inadequate, there was no fingerprint evidence, the DNA evidence was inconclusive given the possibility that McKay's DNA was indirectly transferred onto the manufactured firearm and latex glove, and that the Government's evidence was unpersuasive as to his control of the apartment where the gun and ammunition were found. (*Id.* at 5-6).

The Court addressed most of these arguments when it denied McKay's initial Rule 29 motion. McKay now seeks a second bite at the apple but presents nothing new to overcome the Court's prior holding that there was sufficient evidence of his guilt. The pistol and ammunition were recovered from the apartment where McKay was sleeping when he was arrested and where he had been residing for at least one week. During the search, McKay asked officers whether they had found a gun in the bathroom—which they had. The jury also viewed surveillance footage from the stairwell outside the apartment showing a man resembling McKay, wearing clothing later recovered from the apartment he was living in, brandishing what appeared to be a firearm. Jones, who was also depicted in the footage, testified that the individual was McKay and that he was holding a gun. An officer familiar with firearms likewise testified that the object in the video appeared to be a firearm. Even absent that testimony, the jury was entitled to view the footage and draw its own conclusions about the nature of the object shown. In addition, a forensic analyst testified that DNA recovered from the firearm and from a latex glove found in the same bag as the firearm matched McKay. Taken together, this evidence was more than sufficient to permit a rational jury to find McKay guilty beyond a reasonable doubt.

McKay emphasizes that others had access to the apartment and that no fingerprints linked him to the firearm or ammunition. But neither fact is dispositive of possession. *See Price*, 28 F.4th at 753; *United States v. Morris*, 576 F.3d 661, 670 (7th Cir. 2009) ("[T]hat the car was not registered in Morris's name, that other people occasionally had access to the vehicle, and that there were no fingerprints found on the drugs or the gun do nothing to change that conclusion [that the evidence was sufficient to find that the defendant constructively possessed the drugs and firearm found in the car]."); *Young v. City of Chicago*, 987 F.3d 641, 645 (7th Cir. 2021) ("The exclusive

dominion and control required to establish constructive possession is not diminished by evidence of others' access to the contraband.").

McKay's remaining arguments challenge the witnesses' credibility. He contends that Jones was not credible and that his DNA expert was more persuasive than the Government's forensic analyst. (Dkt. 133 at 3-6). "On a Rule 29 motion, these arguments are a nonstarter." *United States v. Morales*, 572 F. Supp. 3d 502, 509 (N.D. Ill. 2021). The Seventh Circuit has made clear that it is "the exclusive function of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences." *United States v. Godinez*, 7 F.4th 628, 638-39 (7th Cir. 2021) (citations and quotations omitted). The jury observed Jones's testimony, heard any inconsistencies in her statements, and compared her account with the surveillance footage. Likewise, the jury heard Hill explain her DNA analysis and then considered Ballard's competing opinions. Defense counsel thoroughly cross-examined these witnesses. The jury resolved those credibility disputes, and the Court will not second-guess its determinations on a Rule 29 motion. *See United States v. LeBeau*, 949 F.3d 334, 346 (7th Cir. 2020).

Viewing the evidence in the light most favorable to the Government and deferring to the jury's credibility determinations and rational inferences, the Court finds McKay fails to establish that "no rational trier of fact could have agreed with the jury." *United States v. Brown*, 973 F.3d 667, 682 (7th Cir. 2020). Therefore, the Court denies McKay's Motion for Judgment of Acquittal. *See, e.g., United States v. White*, 95 F.4th 1073, 1079 (7th Cir. 2024) (affirming denial of motion for judgment of acquittal on § 922(g) conviction where "the evidence as a whole" was sufficient to establish the requisite possession).

## II. Motion for New Trial

### A. Legal Standard

Pursuant to Federal Rule of Criminal Procedure 33, the Court "may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). The burden is on the defendant to show that the interest of justice requires re-trial. *See U.S. v. Smith*, 674 F.3d 722, 728 (7th Cir. 2012). "Granting a new trial in the 'interest of justice' is reserved for only the most extreme cases, and we approach such motions with great caution and are wary of second-guessing the determinations of both judge and jury." *United States v. Coscia*, 4 F.4th 454, 465 (7th Cir. 2021) (citations and quotations omitted). This burden is high; a jury verdict in a criminal case is "not to be overturned lightly." *United States v. Santos*, 20 F.3d 280, 285 (7th Cir. 1994) (citation omitted). A new trial is warranted only in "rare cases in which consideration of the evidence leaves a strong doubt as to the defendant's guilt of the charged offense." *United States v. Peterson*, 823 F.3d 1113, 1122 (7th Cir. 2016) (citation omitted).

McKay argues that a new trial is warranted because the Government committed a *Napue* violation. (Dkt. 132 at 15). In *Napue* v. *Illinois*, the Supreme Court held that the Government may not "knowingly use false evidence, including false testimony, to obtain a tainted conviction." 360 U.S. at 264, 269 (1959). A conviction obtained through the knowing use of perjured testimony violates due process. *See Glossip v. Oklahoma*, 604 U.S. 226, 246 (2025) (citing *Napue*, 360 U.S. at 269)). A party may seek a new trial under Rule 33 based on a *Napue* violation. *See United States v. Reed*, 986 F.2d 191, 192 (7th Cir. 1993) (recognizing that "courts have interpreted Rule 33 to require a new trial in a variety of situations in which trial errors or omissions have jeopardized the defendant's substantial rights"); *United States v. O'Malley*, 833 F.3d 810, 813 (7th Cir. 2016) (holding that constitutional claims are properly raised in Rule 33 post-judgment motions).

**B. McKay's Oral Motion for Mistrial**

Before addressing the merits of McKay's Rule 33 Motion, the Court will summarize the events at trial that led to this dispute. After Jones testified, McKay's counsel advised the Court that they believed Jones "made some misrepresentations on the stand that maybe implicate *Napue*." (Dkt. 2123, Tr. 324:7-10). McKay's counsel was particularly concerned about Jones's statements that she had not asked for a reward for her testimony because they contradicted text messages an FBI agent had received. (*Id.* at 324:11-325:6). The Court permitted McKay's counsel to ask the agent about those messages when he testified. (*Id.* 325:22-25). McKay's counsel raised their concerns again the following day, this time arguing that there was reason to believe Jones was convicted of false informing in 2004 despite her testimony denying knowledge of that charge. (Dkt. 124, Tr. 420:1-12). McKay's counsel believed that the May 2004 conviction belonged to Jones because it was listed in a report about Jones from the National Criminal Information Center ("NCIC report") that the Government provided before trial. (*Id.*); (*see also* Dkt. 134 at 7, Dkt. 132-1). They also pointed out that the arrest report from the May 2004 charge shows that one of the names the arrestee provided at the time of arrest was "Shari Jones," and Jones was accused of giving a false name to police when she was arrested on an outstanding warrant in 2022. (Dkt. 124, Tr. 420:1-12). McKay's counsel argued that the Government had a duty to correct Jones's alleged false testimony about the 2004 charge through a stipulation and stated that it would move for a mistrial if the Government declined to do so. (*Id.* at 420:13-14, 554:23-555:3).

The Government argued that it had no reason to believe Jones was the person involved in the May 2004 case, and thus no reason to believe that she testified falsely. (*Id.* at 421:20-22, 422:17-24). In support, it submitted the following documents: (1) records of the May 2004 arrest indicating that the arrestee initially provided multiple names and dates of birth, including "Shari Jones (10-20-1978)" but was later identified through fingerprints as Allison D. Jones, whose date

of birth is March 23, 1970; (2) a state-court docket reflecting that "Allison D. Jones" was convicted of false informing in May 2004; (3) an NCIC report for Allison D. Jones showing a photograph of a woman who is not Jones; and (4) Indiana criminal history searches for Jones showing no false informing convictions. (Dkt. 119-2); (Dkt. 119-3); (Dkt. 119-4); (Dkt. 119-7). The Government maintained that NCIC records can contain inaccurate or overlapping information when multiple individuals use the same aliases. (Dkt. 124, Tr. at 422:5-11). It also argued that Jones's 2023 charge for false informing was not admissible to impeach her[2]. (*Id.* 422:25-423:8). Based on the available records, the Government declined to stipulate that Jones had been arrested in 2004 for false informing. (*Id.* at 424:3-13, 427:25-428:3). McKay's counsel acknowledged that the records were conflicting and conceded they could not definitively determine who was responsible for the 2004 conviction. (*Id.* at 571:25-572:1). Nevertheless, they argued there was reason to believe that Jones was involved in the 2004 conviction. (*Id.* at 568:8-20).

After the Government declined to stipulate that Jones testified falsely about the 2004 false informing conviction, McKay's counsel orally moved for a mistrial. (*Id.* at 555:1-3); (Dkt. 125, Tr. 588:14-16). The Court denied the motion, finding insufficient evidence that Jones's testimony regarding the 2004 charge was false or that the Government knowingly elicited false testimony. (Dkt. 124, Tr. 564:8-572:17); (Dkt. 125, Tr. 588:17-18). Additionally, the Court noted that McKay cross-examined Jones about the 2004 charge, allowing the jury to reach their own conclusion about her credibility. Dkt. 124, Tr. 572:12-14). McKay now moves for a new trial based on the same alleged *Napue* violation, this time arguing that he has discovered new evidence proving that Jones testified falsely at trial and that the Government should have known. (Dkt. 132 at 11-15).

**C. Analysis**

---

[2] The parties agreed to a stipulation regarding the 2023 false informing charge. (Dkt. 114 at 3).

To obtain a new trial based on a *Napue* violation, McKay must establish that: (1) there was false testimony; (2) the government knew or should have known it was false; and (3) there is a likelihood that the false testimony affected the judgment of the jury. *See United States v. Coleman*, 914 F.3d 508, 512 (7th Cir. 2019); *United States v. Freeman*, 650 F.3d 673, 678 (7th Cir. 2011). McKay argues that Jones testified falsely about the 2004 false informing convictions that appeared in her NCIC report, that the Government knew or should have known her testimony was false, and that its failure to correct the testimony warrants a new trial. (Dkt. 132 at 1). In the alternative, McKay requests an evidentiary hearing. (Dkt. 132 at  McKay fails to satisfy the knowledge or materiality prongs of this test, so his Motion must be denied. Since the motion, files, and records of the case conclusively establish that McKay is not entitled to relief under Rule 33, the Court need not hold an evidentiary hearing. *See, e.g., United States v. Simpson*, 864 F.3d 830, 834 (7th Cir. 2017).

**1. False Testimony**

McKay asserts that he has obtained new evidence demonstrating that Jones's testimony about the 2004 convictions was false. (Dkt. 132 at 11). Jones's NCIC report, which both parties had before trial, shows, under the subject names "Jones, Allison Rochell" and "Jones, Shari R (AKA)", arrests and convictions for false informing from May and July 2004. (Dkt. 132-1 at 73-75). In the Motion, McKay explains that, after trial, he obtained the booking photographs from the May and July 2004 arrests. (Dkt. 132 at 11); (Dkt. 137 at 5). He presents these pictures alongside a photograph of Jones taken by the Illinois Department of Corrections and the photograph of Alison Jones from her NCIC report.[3] (Dkt. 132 at 10-11); (Dkt. 137 at 4-5). McKay contends this

[3] In the Motion for New Trial, McKay only presented a booking photograph of the July 1, 2004 arrest. (Dkt. 132 at 11); (Dkt. 134 at 11); (Dkt. 137 at 4). The Government argued that this was not enough to show that Jones testified falsely because only the May 2004 conviction was discussed at trial. (Dkt. 137 at 4). During her cross-examination, however, Jones was asked about a 2004 false informing conviction, not a May 2004 conviction. (Dkt. 122, Tr. 112:10-

is enough to conclude that Jones testified falsely when she stated that she had never been convicted of false informing. (Dkt. 137 at 5-6). The Government argues that Jones's testimony was not false because she only testified that she had no knowledge of the convictions. (Dkt. 135 at 15-16).

Even if Jones is depicted in the 2004 booking photographs, McKay fails to establish that Jones perjured herself. To demonstrate the existence of false testimony under *Napue*, a defendant need not provide "conclusive proof that the testimony was false or that the witness could be successfully prosecuted for perjury," it is enough to show that the testimony included "half-truths" and other statements that "give a false impression to the jury." *Freeman*, 650 F.3d at 680. Yet, contradictory statements and ambiguities in a witness's testimony do not "rise to a level of perjury." *United States v. Saadeh*, 61 F.3d 510, 523 (7th Cir. 1995). In *Saadeh*, a witness testified about talking to the defendant about their drug business and observing the defendant accept money from drug deals "on a daily basis." 61 F.3d at 522. On cross-examination, when faced with his criminal records, the witness admitted that he had been in jail for a portion of the period during which he had testified to being with the defendant. *Id.* at 523. The Seventh Circuit agreed with the district court that the witness's "contradictory statements and ambiguities" did not rise to the level of false testimony. *Id.* Similarly, in *Brown v. United States*, one witness testified that they were not present at a real estate closing, and a second witness testified that they were. 2018 WL 287746, at *3 (N.D. Ill. Jan. 4, 2018). The court held that the conflicting information called the second witness's testimony into doubt but did not suggest that she was intentionally lying. *Id.*

Here, when asked if she had a "false informing case" in 2004, Jones testified, "I don't have — 2004? I — you're going to have to tell me about it. I don't know." (Dkt. 122, Tr. 112:10-13). When McKay's counsel reiterated that she had a 2004 false informing conviction, Jones stated,

11, 113:12-13, 114:12-17). Regardless, McKay provided both booking photographs in his Reply so the Government's objection is moot.

"No, I do not. If I had one, I knew nothing about it. I've never been convicted of false informing, obstruction, nothing of that nature," (*Id.* at 112:12-13, and "If I had one, I knew nothing about it." (*Id.* at 114:12-13). These statements may be contradictory and ambiguous, yet they only establish that Jones's testimony was inconsistent with information listed in her NCIC report, which is not enough to show that she perjured herself. *U.S. ex rel. Sharp v. Acevedo*, 2009 WL 2032929, at *9 (N.D. Ill. July 10, 2009) (holding the defendant did not demonstrate that a witness's testimony was false where all the defendant established at trial was that the witness's testimony was inconsistent with prior statements to the police). Moreover, the question remains whether Jones intentionally lied about these charges or simply forgot about them. *See United States v. Bermea-Boone*, 563 F.3d 621, 627 (7th Cir. 2009) (recognizing that false testimony must be given willfully to be perjury, not given because of confusion, mistake, or faulty memory). Regardless, since McKay fails to establish knowledge or materiality, the Court need not determine whether Jones's testimony about the false informing conviction was false.

**2. Knowledge**

Even if Jones testified falsely that she was never convicted of false informing, McKay fails to establish that the Government knew her testimony was false. As discussed above, the parties had conflicting information at trial regarding Jones's criminal history. Although false informing arrests and convictions appear on Jones's NCIC report, state records indicated that she was neither the person arrested nor the person convicted for the May 2004 case. (*See supra* Sec. II.B.). McKay's counsel even conceded at trial that, given the contradictory records, they could not determine conclusively who the convictions were affiliated with. (*Id.*). Now, apparently, the truth is clear. According to McKay, the Government knew Jones testified falsely because the 2004

convictions appear on her NCIC report, which was generated using her FBI number and purportedly contains only records associated with her fingerprints. (Dkt. 132 at 18).

In support of his arguments, McKay cites a 2005 FBI operational manual explaining that each FBI number corresponds to a unique set of fingerprints. (Dkt. 132 at 13). Under the process described in the manual, arresting agencies submit fingerprints to a State Identification Bureau, which updates state records and forwards the information to the FBI. (*Id.* at 13-14). The FBI then compares the fingerprints against existing records nationwide: matching prints are linked to an existing FBI number, while non-matching prints generate a new FBI number. (*Id.* at 14). McKay further notes that Jones's NCIC report states that "all entries contained in this FBI record are based on fingerprint comparisons and pertain to the same individual." (*Id.* at 15); (*see* Dkt. 132-1 at 77). From this, McKay contends that the Government knew the false informing charges were associated with Jones, notwithstanding other evidence indicating that the charges belonged to an individual named Allison Jones. (*Id.* at 18). The Government, however, denies such knowledge, maintaining that it did not know Jones was the individual convicted of false informing in 2004 and therefore could not have knowingly elicited false testimony. (Dkt. 134 at 7-14). McKay urges the Court to disregard these assertions, but the Court is not inclined to accuse the Government of lying about what it claims to have known or not known.

The Seventh Circuit's decision in *United States v. Are* is instructive. 590 F.3d 499 (7th Cir. 2009). There, a police officer testified that, to his knowledge, the defendant's wife had not been pulled over on the day their house was searched. *Id.* at 508. During a break in trial, the government received information that an officer had searched the wife's car on the day in question. *Id.* After trial, the government received additional information confirming that a search of the wife's vehicle had been requested. *Id.* at 509. The Seventh Circuit nevertheless held that the defendant failed to

establish a *Napue* violation because the information available to the government did not show that the testifying officer knew about or participated in the search. *Id.* at 509-10. As such, the Court concluded, the government had no reason to believe that the officer was not telling the truth. *Id.* at 509. The same reasoning applies here. Even accepting McKay's assumption that the agents and prosecutors were familiar with the decades-old FBI manual, the information available to the Government before and during trial did not establish that Jones was the person charged or convicted of false informing in 2004. At most, the NCIC report shows that fingerprints from the 2004 arrests were linked to Jones in the NCIC database. In light of the conflicting state records, the Government had no reason to believe Jones was lying when she denied knowledge of the charges. The inconsistent evidence may have called Jones's testimony into doubt but, as the Seventh Circuit made clear, "*Napue* does not require the government to recall [a witness] in its rebuttal case to clear up any possible confusion when the witness's testimony was not perjurous." *Are,* 590 F.3d at 509.

Moreover, this is not a situation where the Government prevented the defense from obtaining evidence in its possession that would have conclusively established that Jones had perjured herself. *See, e.g., Glossip*, 604 U.S. at 239-241 (granting the defendant a mistrial where, years after trial, the government uncovered trial documents the prosecution had prevented the defense from obtaining that showed a key witness gave false testimony). In fact, the Government provided McKay with Jones's NCIC report before trial. (Dkt. 134 at 7). This further undermines McKay's theory that the Government was knowingly suborning perjury. *See Coleman*, 914 F.3d at 512 (the fact that the government provided records that cast doubt on a witness's testimony was "inconsistent with [the defendant's] theory that the government was engaged in the knowing use of perjured testimony"). McKay may believe the Government was wrong to conclude that Jones

was not the individual convicted of the 2004 charges, but he has not shown that the Government possessed the knowledge it expressly disclaims.

In the alternative, McKay argues that the Government should have known Jones's testimony was false. (Dkt. 132 at 18-20). He relies heavily on *Freeman*, contending that the Government's failure to investigate why the 2004 convictions appear in Jones's NCIC report gave it constructive knowledge that she lied on cross-examination when she denied having any false informing convictions. (*Id.* at 19-20). That reliance is misplaced. The "should have known" standard articulated in *Freeman* imposes an affirmative duty on prosecutors to investigate obvious problems with a witness's testimony. *Freeman*, 650 F.3d at 673. In *Freeman*, a witness testified that he had been with the defendants at a penthouse on several occasions. *Id.* at 677. Defense counsel later informed the government that one defendant had been incarcerated during the relevant period. *Id.* at 677-78. Although the prosecutors initially disputed the claim because the incarceration records appeared unclear, they eventually stipulated that the records were accurate. *Id.* at 678. Nevertheless, the government continued to rely on the witness's testimony during its closing argument. *Id.* The court held that the government "abdicated its responsibility by failing to investigate and determine" whether the defendant could have been at the penthouse as the witness claimed. *Id.* at 680 As a result, the court concluded that the government should have known the testimony was false. *Id.*

*Freeman* thus establishes that prosecutors may have constructive knowledge of false testimony when they fail to investigate evidence suggesting a witness has committed perjury. 650 F.3d at 680. Unlike the prosecutors in *Freeman*, however, the Government did not "simply ignore evidence that its witness [was] lying." *Id.* After McKay raised concerns about Jones's testimony based on the false informing convictions reflected in her NCIC report, the Government took steps

to determine whether those convictions belonged to Jones and, if not, why they appeared in her record. (Dkt. 134 at 12). It obtained an arrest report and court records showing that an individual named Allison Jones was arrested in Indiana in May 2004 for false informing and was later convicted. (*Id.*). The Government then searched the NCIC database, confirmed that Allison Jones existed and was not Jones, and verified that no Indiana criminal cases were associated with Jones. (*Id.*). The Government did not, as McKay contends, "sit on its hands." (Dkt. 132 at 20-21).

It was reasonable for the Government to conclude, based on the information it obtained at trial and its belief that individuals can get conflated with one another on NCIC reports, that the 2004 convictions listed on Jones's NCIC report were incorrectly associated with Jones in the NCIC database because Jones and Allison Jones had used each other's names as aliases. Now that McKay has obtained booking photographs from the 2004 arrests, he argues that the convictions were correctly listed in Jones's NCIC report because she committed the offenses. (Dkt. 132 at 11-13). To explain why Indiana identified a different individual as the perpetrator of the May 2004 charge, McKay theorizes that Indiana stored Jones's fingerprints under Allison Jones's name and date of birth and transmitted those erroneous records to the FBI. (*Id.* at 15). According to McKay, the FBI then matched the fingerprints to Jones and linked the records to her FBI number, causing them to appear in her NCIC report. (*Id.*). In McKay's view, a proper investigation would have led the Government to the same conclusion. (*Id.* at 20-21).

But the Government did investigate the 2004 convictions; it simply did not take the specific steps McKay now believes it should have taken. McKay argues that the Government should have contacted the FBI's Criminal Justice Information Services division to determine how the convictions came to appear in Jones's NCIC report. (Dkt. 132 at 20). Yet the Government had no reason to because it reasonably believed the convictions belonged to another person and had been

mistakenly conflated with Jones's records. McKay also contends that the Government should have obtained the underlying fingerprint records from the 2004 arrests. (Dkt. 132 at 20). But that step would not necessarily have resolved the issue, given that the underlying records from the May 2004 arrest identified Allison Jones as the arrestee. (Dkt. 119-7 at 13-15).

When presented with information that potentially contradicted Jones's testimony, the Government took steps to determine whether a conflict existed and, if so, whether it required correction. In doing so, the Government "conduct[ed] an honest search for the truth while dealing with a less than veracious witness." *United States v. Ogle*, 425 F.3d 471, 477 (7th Cir. 2005) (holding that the defendant failed to establish that the government knowingly presented perjured testimony). The Court does not read *Freeman* to impose a more demanding obligation on the Government. Accordingly, the Court cannot conclude that the Government knew or should have known that Jones testified falsely regarding prior convictions for false informing.

**3. Materiality**

Finally, McKay would not be entitled to a new trial, even assuming the Government knowingly presented Jones's false testimony, because the evidence is not material. A defendant is only entitled to a new trial based on a *Napue* violation if the "false testimony 'may have had an effect on the outcome of the trial'. . . that is, if it 'in any reasonable likelihood [could] have affected the judgment of the jury.'" *Glossip*, 604 U.S. at 246 (citing *Napue*, 360 U.S. at 272 and *Giglio v. United States*, 405 U.S. 150, 154 (1972). This materiality standard requires the "beneficiary of the constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Glossip*, 604 U.S. at 246 (cleaned up). The key considerations in a materiality analysis are: (1) whether the witness was essential to the jury's verdict and (2) whether the defendant had an adequate opportunity to expose the alleged false testimony on cross-

examination. *See, e.g., Saadeh*, 61 F. 3d at 523-24; *United States v. Miller*, 795 F.3d 619, 626 (7th Cir. 2015). Evidence can be material even if, as is the case here, it "goes only to the credibility of the witness." *Glossip*, 604 U.S. at 248 (citing *Napue*, 360 at 269).

McKay fails to establish that Jones's alleged false testimony about the 2004 convictions was material to the outcome of the trial. First, Jones's testimony was not the only, or even the most important, evidence of McKay's guilt. *See Griffin v. Pierce*, 622 F.3d 831, 843 (7th Cir. 2010) (holding that there was no *Napue* violation where the witness's testimony "was in no way the only or even strongest piece of evidence against [the defendant]"). McKay relies on *Glossip* to argue that Jones's alleged false testimony was material because she was an important witness whose credibility may have been damaged if the perjury was corrected. (Dkt. 132 at 21-24); (Dkt. 137 at 10-19). But *Glossip* does not help McKay.

In *Glossip*, co-defendant and witness Justin Sneed claimed that the other defendant, Richard Glossip, paid him to murder his boss. 604 U.S. at 231. When asked about medical records showing that he had been prescribed lithium, Sneed testified that he had never seen a psychiatrist and did not know why he had been prescribed the drug. *Id.* at 235. In its case against Glossip, the prosecution argued that Sneed would not have murdered the victim of his own accord because he did not have a "propensity to violence except at Glossip's direction." *Id.* at 236. Glossip was convicted of murder and sentenced to death. *Id.* Years later, the state discovered trial documents that had not been made available to Glossip before or during trial showing that Sneed's testimony was false—Sneed had been diagnosed with bipolar disorder, which was why he had been prescribed lithium. *Id.* at 239. The Supreme Court held that the state's failure to correct Sneed's false testimony was material. *Id.* at 248-49. First, the Court noted that Sneed's testimony was "the only direct evidence of Glossip's guilt," so the jury's assessment of his credibility was "necessarily

determinative" of the case. *Id.* at 248. It also explained that correcting Sneed's false statements about his mental health would have harmed his credibility by exposing him as untrustworthy and willing to lie to the jury under oath. *Id.* As such, considering Sneed's importance to the state's case, this alone made the false testimony material. *Id.* The Court also noted that correcting Sneed would have undermined the prosecution's theory that Sneed was harmless without Glossip. *Id.* at 249. Therefore, the Court concluded, there was a reasonable likelihood that Sneed's false testimony affected the judgment of the jury. *Id.*

Here, unlike in *Glossip*, Jones's testimony was not the only evidence of McKay's guilt. Since McKay stipulated to his past felony charges, the Government's case was focused on establishing that he possessed the gun and ammunition found at the apartment. Jones's testimony was certainly important in this regard—she identified McKay as the man in the surveillance video, described seeing him that day and on other occasions in the apartment complex with a gun, and testified that he lived in the apartment that was searched. (Dkt. 122, Tr. 93:1-106:6). However, as discussed above, there was overwhelming evidence beyond Jones's testimony that established the possession element. (*See supra* Sec. I.B.).

Furthermore, in its closing, the Government acknowledged that Jones was not perfect and made clear to the jury that they did not have to rely solely on her word. (Dkt. 125, Tr. 602:4-6, 603:24-604:2). Instead, the Government asked the jury to credit Jones's testimony to the extent it aligned with what the jury could see for itself in the video. (*Id*. at 604:2-6). Thus, the Court cannot conclude that the case "rested centrally" on Jones's credibility. *Glossip*, 604 U.S. at 250; *see also Brown*, 2018 WL 287746, at *3 ("The knowing use of false testimony alone, however, is not sufficient to warrant a new trial if the evidence against the defendant is otherwise so strong that

the testimony in question was not necessary to obtain the conviction.") (citing *Freeman*, 650 F.3d at 682).

Courts in this Circuit have similarly declined to find a witness's false testimony material when there was other overwhelming evidence of the defendant's guilt. *See, e.g., Saadeh*, 61 F.3d at 523 (defendant failed to provide sufficient evidence "to suggest that a jury might have convicted him based on [witness's alleged false testimony] rather than because of [defendant's] extensively proven involvement in the charged crime"); *Are*, 590 F.3d at 510 (holding that there was no reasonable likelihood that alleged false testimony affected the jury's judgment where the government's case against the defendant was substantial); *Griffin*, 622 F.3d at 843 (holding that the defendant failed to establish a *Napue* violation where the witness's testimony, although important, "was not essential to the State's case given all the other weighty evidence"); *Brown*, 2018 WL 287746, at *4 (holding that it was "unlikely" that the alleged false testimony would have affected the jury's judgment where other evidence "unambiguously establishe[d]" the defendant's involvement in the crime); *Maciel v. United States*, 2014 WL 1848617, at *3 (N.D. Ill. May 8, 2014) (false testimony was not material where the government "presented overwhelming evidence of [the defendant's] guilt and the credible testimony was corroborated with the surveillance and wire tap evidence"); *United States v. Nichols*, 2019 WL 398775, at *26-27 (N.D. Ill. Jan. 31, 2019), *aff'd*, 77 F.4th 490 (7th Cir. 2023) (alleged false testimony was not material where there was "additional overwhelming evidence" of defendant's guilt).

The cases McKay cites in support of his argument—*Freeman* and *United States v. Lee*, 2025 WL 1768889 (N.D. Ill. June 26, 2025)—do not change the Court's conclusion. First, in *Freeman*, the Seventh Circuit found that the alleged false testimony affected the outcome of the trial because the "case promised by the government" was "not what it delivered," the witness's

testimony filled in "many necessary details that gave flesh and context to the government's evidence," and the rest of the government's case was not strong. 650 F.3d at 681-82. Here, however, there was enough strong evidence of McKay's possession that Jones's testimony was not "mere surplusage." *Id.* at 682. In *Lee*, the court relied on a Ninth Circuit case to hold that false testimony is material if there is any reasonable likelihood that it could have affected the jury even if the remaining evidence could have been sufficient for a conviction. 2025 WL 1768889, at *3-6 (citing *Clements v. Madden*, 112 F.4th 792, 804 (9th Cir. 2024)). This is not the materiality standard used in this Circuit, so the Court declines to follow *Lee*, a non-precedential decision.

McKay also argues that Jones's false testimony was material because the Government "made it clear that [her] testimony was an important piece of the evidence." (Dkt. 132 at 24). While the Government may have acknowledged that Jones's testimony was important to its case, (Dkt. 125, Tr. 632 at 11-13), it expressly urged the jury to consider it along with other evidence in making its decision. (*Id.* at 642:2-3) ("[S]he, along with the rest of the evidence, is crucial"); (*Id.* at 603:24-604:2) ("And the government is not just asking you to rely on Shari Jones' testimony. The government is asking you to rely on it in conjunction with all of the other evidence in this case."). More importantly, the Government did not rely on Jones's alleged false statements in its closing arguments; in fact, it did not mention them at all. *See, e.g., United States v. DiCosola*, 2015 WL 2330233, at *5 (N.D. Ill. May 14, 2015), *aff'd*, 867 F.3d 793 (7th Cir. 2017) (holding that the defendant failed to demonstrate a *Napue* violation based on a witness's alleged false statements, noting "most importantly, the Government did not mention [the witness's] misstatement during its closing); *Are*, 590 F.3d at 509-10 (finding that the defendant failed to establish the requisite materiality for a *Napue* violation where the government did not "knowingly rely on false statements" in its closing arguments).

The Court must also consider whether McKay had an adequate opportunity to expose Jones's alleged false testimony on cross-examination.[4] *See Simental v. Matrisciano*, 363 F.3d 607, 615 (7th Cir. 2004). "When a defendant has, and takes advantage of, the opportunity to cross-examine, discredit, and expose a witness's perjury, the likelihood that perjured testimony will have affected the judgment of the jury is greatly diminished." *Coleman*, 914 F.3d at 513 (internal quotation marks omitted). McKay had the opportunity to, and did, vigorously cross-examine Jones about the 2004 false informing convictions that appeared in her NCIC report. (Dkt. 122, Tr. 112:10-115:2). Jones denied any knowledge of the charges and declined to view her NCIC report when asked if she would like to refresh her recollection. (*Id.*). McKay's counsel then argued in their closing statement that Jones was a liar. (Dkt. 125, Tr. 618:7-619:6). The defense counsel's cross-examination and closing argument allowed the jury to do its job and "sift through inconsistencies and contradictions and decide what testimony to credit and what evidence to reject." *U.S. ex rel. Thurman v. Page*, 2000 WL 1221035, at *8 (N.D. Ill. Aug. 18, 2000) (holding that defendant failed to establish that the government knowingly used false testimony). Given this, there is no reasonable likelihood that the alleged false testimony affected the jury's judgment. *See, e.g., United States v. Cosby*, 924 F.3d 329, 336 (7th Cir. 2019) (alleged false testimony was not material where defendant "had a full opportunity to impeach" the witness and "let the jury determine the impact of the testimony"); *Saadeh*, 61 F.3d at 523-24 (same where the defendant attempted to expose witness's false testimony on cross-examination and then argue in closing that the witness was a liar); *Miller*, 795 F. 3d at 626 (defendant failed to establish *Napue* violation

[4] McKay argues that this is no longer a relevant factor under *Glossip*. (Dkt. 137 at 19). In *Glossip*, a witness provided false testimony on direct examination and repeated it on cross-examination. 605 U.S. at 235, 254 n.10. The Supreme Court noted that, even if the defendant had not asked about the issue, the prosecution still would have had a duty to correct the false testimony it elicited. *Id.* at 254 n.10. This dicta does not preclude courts from considering whether the cross-examination of a witness regarding alleged false testimony impacted the likelihood that testimony affected the jury's judgment.

where he "had ample opportunity to bring to light any false or misleading statements on cross-examination and did, in fact" elicit some misleading testimony).

For these reasons, McKay fails to establish a *Napue* violation. Accordingly, the Court finds that McKay is not entitled to a new trial.

## CONCLUSION

For the reasons explained above, the Court denies McKay's Motion for New Trial [130] and Motion for Judgment of Acquittal [133]. McKay's Motion to File under Seal [131] is granted. The jury's verdict stands.

Virginia M. Kendall
United States District Judge

Date: August 24, 2026